The Full Commission has reviewed the prior Opinions and Awards based upon the record of the proceedings before Deputy Commissioner Lorrie Dollar and the briefs and arguments on appeal. Plaintiff has shown good grounds to reconsider the evidence and to amend the holding of the prior Opinion and Award filed July 10, 1998. Accordingly, the Full Commission has modified the Findings of Fact, Conclusions of Law, and Award.
Defendants have not shown good ground to reverse the Interlocutory Opinion and Award filed by Deputy Commissioner Dollar on April 8, 1997. Accordingly, jurisdiction in this case is affirmed.
The plaintiff, a professional football player, was injured in practice while playing for the Carolina Panthers in the state of South Carolina. The case was heard in two phases before Deputy Commissioner Lorrie L. Dollar. The first phase dealt with the defendants' contesting of jurisdiction under the North Carolina Workers' Compensation Act. In an Interlocutory Opinion and Award filed April 8, 1997, Deputy Commissioner Dollar decided that issue against the defendants and the case proceeded to the merits. By subsequent Opinion and Award dated July 10, 1998, Deputy Commissioner Dollar awarded plaintiff benefits, although in an amount less than what plaintiff contended plaintiff was entitled.
From this second Opinion and Award, both parties appealed. Plaintiff appealed on the issue of entitlement to additional benefits. Defendants contested jurisdiction by the State of North Carolina as well as whether the claimant was entitled to any benefits.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Revised Pre-Trial Agreement dated May 14, 1997, and at the hearing on May 19, 1997, as:
 STIPULATIONS
1. The parties agree that the plaintiff sustained an injury by accident on June 8, 1995.
2. Plaintiff is a six foot one inch, 315 pound male, born April 24, 1970. Plaintiff attended college, but did not finish. Thereafter, plaintiff played for a semi-professional football team, playing primarily the position of nose tackle.
3. After playing for the semi-professional football team, plaintiff played for a professional football team, the Buffalo Bills, during the season ending December, 1994, again at the nose tackle position.
4. In 1995, plaintiff entered into a professional football contract with the Carolina Panthers professional football team with a beginning date of April 27, 1995. The term of the contract was April 27, 1995 to February 28, 1996. The salary to be paid under the contract was $85,000.00 plus a $1,000.00 signing bonus. Under the terms of the standard National Football League players contract, in the event plaintiff was injured and could not play professional football for that year, plaintiff would be paid this salary of $85,000.00 plus the $1,000.00 signing bonus, regardless of whether plaintiff would have made the team. Additionally, plaintiff would be paid another $40,000.00 if plaintiff made the active or inactive roster for the Panthers, but plaintiff did not.
5. At the time the contract was signed, plaintiff was living in Florida and came to the Carolinas to play beginning on or about April 28, 1995. Housing was provided by the Panthers at its location at Winthrop College in Rock Hill, South Carolina. In addition, plaintiff was paid $50.00 per day plus a $28.57 per diem
during the training camp which lasted from April 28, 1995 to June 9, 1995.
***********
The Full Commission makes findings of fact as follows:
 FINDINGS OF FACT
1. The date of plaintiff's stipulated injury by accident is June 8, 1995. In 1995 the Carolina Panthers were in the process of building their stadium (Ericcson Stadium) in Charlotte, North Carolina. Clemson, South Carolina was chosen as an alternate site to practice and play a season while the Panthers waited for completion of their own stadium. While the coaching and training-related activity were temporarily moved to the state of South Carolina, the principal place for the business operations side of the Carolina Panthers remained at 227 Trade Street in Charlotte, North Carolina, from 1992 until 1996 when the team moved to Ericcson Stadium in Charlotte.
2. Facts showing that the business operations side of the Carolina Panthers was at all times located in Charlotte include:
 A. Richardson Sports, Limited became a North Carolina limited partnership in 1989 and is the legal vehicle that owns the Carolina Panthers.
 B. A North Carolina corporation, PFF, Inc. is the general partner to Richardson Sports, Limited.
 C. Since the early 1990s, it was the intention of the Carolina Panthers to be based in Charlotte, North Carolina.
 D. Jerome J. Richardson, owner of the Carolina Panthers, when questioned at the November 26, 1996, hearing as to who remained in Charlotte stated, "What remained in Charlotte would be what I call business people."
 E. Mark Richardson (son of Jerry Richardson) was Vice President of Richardson Sports, Limited, and the "top person" for the business side of the Carolina Panthers. His office was located in and remained in Charlotte at 227 Trade Street until the move to Ericcson Stadium in 1996.
 F. Jerome J. Richardson, Jr. (Jerry Richardson's eldest son) held the position of Secretary/Treasurer of the corporation and his office was at all times located at 227 West Trade Street in Charlotte until the move to Ericcson Stadium in 1996.
 G. William Polian, general manager of the Carolina Panthers testified that Charles Waddell served as Assistant Director of Business Operations and that his office was located in North Carolina at 227 West Trade Street during the year 1995.
 H. The operations of the limited partnership (Richardson Sports) are conducted by the general partner (PPF, Ltd). During the period 1994 to 1996 offices of three of the four officers for the general partner were physically located at 227 West Trade Street in Charlotte.
 I. The "home office" address for Richardson Sports, Limited is listed as 227 West Trade Street, Suite 1600, Charlotte, North Carolina on the application made to the State of South Carolina for Registration of Foreign Limited Partnership both for PFF, Inc. and Richardson Sports Limited as a North Carolina limited partnership qualifying to do business in the state of South Carolina in November, 1993.
 J. Question No. 8 of the Application for Registration of Foreign Limited Partnership made to the State of South Carolina requests the "address of office at which is kept a list of names and addresses of Limited Partners and their capital contributions". The North Carolina address of 227 West Trade Street, Suite 1600, Charlotte, North Carolina 28202 was listed as the answer.
 K. No amendment was ever made to this application to indicate a different home address or principal place of business from 227 West Trade Street to any other location during 1994-1996.
 L. The only address change that was made to this application was the change of address from 227 West Trade Street in Charlotte to Ericcson Stadium in Charlotte in 1996.
 M. The NFL Player Contract between Leonard Larramore (Player) and Carolina Panthers, (Club) signed on April 28, 1995 by William Polian, on behalf of the Carolina Panthers, listed 227 W. Trade St., Ste. 1600, Charlotte, NC 28202 as the address of the Carolina Panthers.
 N. An October 2, 1995, check from the Carolina Panthers was issued to plaintiff with the account name and address listed on the check of Richardson Sports, 227 W. Trade St., Suite 1600, Charlotte, NC 28202. This would indicate that the bookkeeping aspect of the Carolina Panthers was handled through the Charlotte home office.
 O. The off-season conditioning program payment records referencing payments for off-season conditioning in May of 1995 with fax stamp imprint indicates that these documents were faxed from the Charlotte home office fax number of (704) 358-0769 at 227 W. Trade Street.
 P. Invoice to Richardson Sports at 227 W. Trade Street #1600, Charlotte, NC 28202 from Mann Travels in Charlotte for transportation expense for plaintiff in 1995 would indicate that travel arrangements for players were made through the home office in Charlotte with a Charlotte based travel agency.
 Q. Interoffice memos regarding payments to players had the home office address of 227 West Trade Street in Charlotte. In addition, the fax-stamp imprint indicates that these documents were faxed from the home office fax number of (704) 358-0769.
 R. Plaintiff's 1995 W-2 and Earnings Summary lists his employer's address as 227 W. Trade St., Ste. 1600, Charlotte, NC 28202.
 S. Copies of Dr. Joe Kallan's medical reports of 8/25/95 and 9/11/95 were sent to the general manager of the Carolina Panthers at the home office of 227 West Trade Street, Suite 1600, Charlotte, NC.
3. While the team management of the Carolina Panthers temporarily moved to South Carolina during 1995, it is clear that the business end which handled the books and records of account for the Carolina Panthers remained at 227 W. Trade Street in Charlotte, North Carolina until the time it moved to Ericcson Stadium in Charlotte. Plaintiff was employed by Richardson Sports, doing business as the Carolina Panthers, whose place of business was in North Carolina. Thus the North Carolina Industrial Commission has jurisdiction pursuant to N.C. Gen. Stat. § 97-36(b) although the actual injury occurred in South Carolina.
4. At the time of the injury giving rise to this claim, the plaintiff was a twenty-five year old male who attended junior college. Plaintiff played semi-professional football as a nose tackle, which is a position on the defensive team. The nose tackle position requires strength and speed, as this position lines up opposite the center and is hit each play by the center or a guard.
5. Plaintiff left college in 1991. Plaintiff began playing semi-professional football in 1993. In the 1994 football season, plaintiff played for the Buffalo Bills, a professional team. Plaintiff injured his ankle while with the Buffalo Bills and was placed on the inactive roster. Plaintiff tried out for the Jacksonville Jaguars in 1995.
6. From the spring of 1993 to January of 1994, plaintiff was a youth minister on a full-time basis. Plaintiff next attempted to play in the World League for the Scottish team. However, plaintiff was released before plaintiff ever played.
7. On or about April 27, 1995, the plaintiff entered into a contract with the Carolina Panthers. The contract term was from April 27, 1995, to February 28, 1996. Pursuant to the terms of the contract, the plaintiff was to be paid a salary of $85,000.00, with a $1,000.00 signing bonus. Under the terms of the contract, in the event plaintiff was injured and could not play professional football for that year, plaintiff would be paid this salary of $85,000.00 plus the $1,000.00 signing bonus, regardless of whether plaintiff would have made the team.
8. On or about April 27, 1995, the plaintiff reported to the Panthers' mini-training camp, at which time plaintiff underwent a physical examination. No back problems were reported, and the plaintiff participated in mini-training camp from April 28, 1995 through April 30, 1995. Plaintiff was paid $50.00 per day plus a per diem of $28.57 for a total of $78.57 per day. The plaintiff earned $235.72 for the three-day camp.
9. Following the mini-camp, the plaintiff remained at the training facility in Rock Hill, South Carolina, to participate in an off-season conditioning program. Plaintiff was paid $200.00 per week for the four-week program.
10. The second pre-season mini-camp began on 30 May 1995. The plaintiff was to be paid $550.00 per week for the second mini-camp which was to run through 9 June 1995. Plaintiff actually earned $707.16 for the period from 30 May 1995 through 8 June 1995, the date of his injury.
11. On or about 8 June 1995, while engaging in bag drills, the plaintiff slipped and fell on the wet field, landing on his buttocks and injuring his back. This constituted an accident within the course and scope of plaintiff's employment.
12. The plaintiff reported to John Kasik, the team's certified athletic trainer, that his back felt tight following the injury. Trainers applied electric stimulation and cold pack therapy to plaintiff's back, and plaintiff was excused from remaining practice on June 8, 1995.
13. On June 9, 1995, the plaintiff was unable to practice due to the back injury, and plaintiff was excused from practice, as it was the last day of the mini-camp.
14. On June 19, 1995, after the plaintiff returned to his home in Jacksonville, Florida, plaintiff telephoned John Kasik to request chiropractic care. Mr. Kasik recommended continued rest and ice packs for plaintiff's back, and plaintiff was advised to contact Mr. Kasik if plaintiff felt unable to get his conditioning done. Following these camps, plaintiff was given a conditioning goal of weight loss to 300 pounds, by the next camp.
15. On July 14, 1995, the plaintiff returned to the Panthers' training facility. Team physician Dr. Donald D'Alessandro performed a pre-season physical examination, noting that the plaintiff had taken a week off following the lumbar strain, but that plaintiff had begun therapy and running. Plaintiff further reported that he was able to run without back pain, had no leg pain, and only minimal discomfort when lying on his back; however, plaintiff reported feeling 100% for practices. X-rays reported no significant abnormality, and the lumbar strain was found to be resolving. Based upon the plaintiff's examination and his description of his physical activities, Dr. D'Alessandro released plaintiff to practice.
16. On July 15, 1995, the Panthers' management cut the team roster, and the plaintiff was dismissed from the team. Plaintiff returned to Dr. D'Alessandro for an exit exam before going home. However, the examination and findings did not differ from that of July 14, 1995, and the doctor told plaintiff to rest his lower back from lifting weights, and should plaintiff have continued symptoms in a month, Dr. D'Alessandro recommended that plaintiff be evaluated by a spine surgeon.
17. After returning home, the plaintiff filed an injury grievance through the National Football League Players' Association legal counsel against the Panthers.
18. On August 4, 1995, plaintiff was examined by Dr. Fady El-Bahri, an orthopaedist, and x-rays were reported as normal. An MRI revealed a central to somewhat left-sided disc herniation at L5-S1 impinging upon the thecal sac to a mild degree, evidence of degenerative disc disease, and a small left lateral disc herniation at L4-5. Plaintiff reported a history of low back pain with radiation into the left hamstring and left leg weakness. Physical therapy was recommended by Dr. El-Bahri. No physical restrictions were ordered, and conservative treatment of therapy, nerve studies and epidural injections were recommended for two to three months.
19. Defendants' team trainer received the bill from Dr. El-Bahri, but the defendants decided not to pay the bill, as the team had no policy for paying medical bills for players who had been released. The Full Commission finds that the treatment by Dr. El-Bahri was reasonably necessary and the Commission therefore approves this treatment.
20. Plaintiff's claim was filed under the South Carolina workers' compensation system and was treated as an accepted claim.
21. Plaintiff did not obtain employment with another professional football team; therefore, plaintiff was unable to play during the 1995-96 season.
22. From September through mid-November of 1995, plaintiff was paid $200.00 per week in unemployment benefits.
23. Plaintiff worked as a teacher's assistant for the Duval County School Board from November of 1995 to June of 1996, for 37.5 hours per week at $6.50 per hour.
24. On July 25, 1996, plaintiff returned to Dr. El-Bahri, at which time plaintiff reported working full time with no lifting. The plaintiff complained of increased pain, constant numbness and tingling in both legs, and night pain. An examination revealed a bilateral sacroiliac joint sprain. Dr. El-Bahri noted his plan to contact workers' compensation for authorization for a microdiscectomy. The Full Commission finds that the treatment by Dr. El-Bahri was reasonably necessary and the Commission therefore approves this treatment.
25. On October 28, 1996, plaintiff began working for AccuStaff, a temporary service, where plaintiff administered employee testing. Plaintiff was paid $8.10 per hour through 25 April 1997, for work on a 40-hour basis. After April 25, 1997, plaintiff was reduced to 15-20 hours per week.
26. Plaintiff participated in a tryout with the Dallas Cowboys in January of 1997. However, plaintiff was not selected for the team.
27. On August 25, 1997, plaintiff was seen by Dr. Joel P. Kallan, an orthopaedist in Miami, Florida, upon referral by the NFL Players' Association and the team owners, for a neutral examination of the injury grievance under the Collective Bargaining Agreement.
28. Plaintiff complained to Dr. Kallan of low back pain and left leg weakness. Examinations were reported as normal. Dr. Kallan opined that with non-steroid anti-inflammatories, the plaintiff could actively participate in football. Dr. Kallan reviewed the MRI previously taken.
29. After receiving Dr. Kallan's report, plaintiff's injury grievance was settled for $5,000.00, which represented one week's pay.
30. At the hearing before the Deputy Commissioner on April 8, 1997, plaintiff was ordered to undergo an independent medical evaluation in order to determine whether further treatment was necessary. However, no additional medical examination was conducted and no additional medical evidence was submitted.
31. Plaintiff may benefit from additional medical treatment for his lumbar spine.
32. A reasonable inference from the facts is that, but for plaintiff's injury, plaintiff would have played for the Carolina Panthers during the contract year and would have earned the contract pay of $85,000.00 plus a $1,000.00 signing bonus.
33. Defendants defended this claim on reasonable grounds.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The North Carolina Industrial Commission has jurisdiction of this matter because the employer's principal place of business was in North Carolina. N.C. Gen. Stat. § 97-36. BrianA. Weber v. Magnum Building Systems, IC No. 249243 (Filed 4/4/97).
2. At the time of the injury giving rise to this claim, the plaintiff had not been employed by the defendants for a fifty-two week period. Therefore, it is appropriate to resort to such other method of computing average weekly wages as will most nearly approximate the amount which the injured employee would be earning were it not for the injury. N.C. Gen. Stat. § 97-2(5). The method which would "most nearly approximate the amount which the injured employee would be earning were it not for the injury" would be to add the contract amount of $85,000.00 and the $1,000.00 signing bonus and divide by 52 weeks, yielding an appropriate average weekly wage of $1,653.85. Hendricks v. Hill Realty Group/KeyRisk, ___ N.C. App. ___, ___ S.E.2d ___ (No. COA98-406, Nov. 19, 1998).
3. As a result of the compensable injury on June 8, 1995, the plaintiff was temporarily totally disabled from June 9, 1995 through July 14, 1995, during which plaintiff is entitled to receive compensation at the rate of $478 per week, the maximum compensation rate for 1995. N.C. Gen. Stat. § 97-29. However, the defendants are entitled to a credit for the $5,000.00 which the plaintiff received in resolution of his injury grievance. The defendants are further entitled to a credit for unemployment benefits, pursuant to N.C. Gen. Stat. § 97-42.1.
4. The plaintiff is entitled to temporary partial disability compensation for the period from June 8, 1995, to the present and continuing for a total of 300 weeks, in the event that his post-injury wage did not meet or exceed the pre-injury wage, pursuant to N.C. Gen. Stat. § 97-30. For the foregoing reasons, plaintiff is entitled to be paid two-thirds of the difference between his average weekly wage of $1,653.85 and the wages plaintiff has earned since June 8, 1995, with a maximum compensation per week of $478, for a total of 300 weeks, subtracting from the 300 weeks the weeks that plaintiff is to receive temporary total compensation. N.C. Gen. Stat. § 97-30.
5. The plaintiff is entitled to reimbursement for medical expenses incurred or to be incurred as a result of his compensable injury, including treatment provided by Dr. El-Bahri. N.C. Gen. Stat. § 97-25.
6. Defendants defended this claim on reasonable grounds and plaintiff's motion to tax attorney fees against defendants should be denied. N.C. Gen. Stat. § 97-88.1.
***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay temporary total disability to plaintiff at the rate of $478 per week for the period from June 9, 1995 through July 15, 1995 with appropriate credit to defendants for the $5,000.00 which the plaintiff received in resolution of his injury grievance and credit for unemployment benefits.
2. Subject to a reasonable attorney's fee herein approved, defendants shall pay plaintiff temporary partial disability compensation at the rate of two-thirds of the difference between $1,653.85 and the post-injury wage for a total of 300 weeks, from June 8, 1995, and subject to the maximum compensation rate of $478 per week for 1995, in accordance with N.C. Gen. Stat. § 97-30. The 300 weeks shall be shortened by the number of weeks that plaintiff is paid temporary total compensation.
3. A reasonable attorney's fee of twenty-five percent of the compensation awarded plaintiff in paragraphs 1 and 2 is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. The defendants shall pay for medical expenses incurred or to be incurred as a result of plaintiff's compensable injury, including for the treatment by Dr. El-Bahri.
5. As the plaintiff has not reached maximum medical improvement, this Opinion and Award does not address this issue. However, in the event that the parties should be unable to agree on the amount of permanent partial disability compensation which may be due plaintiff, either party may request a hearing from the Commission to resolve this matter.
6. Plaintiff's motion to tax attorneys fees against defendants is denied.
7. The defendants shall pay the costs.
This the 20th day of July 1999.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_____________ LAURA K. MAVRETIC COMMISSIONER
S/_____________ BERNADINE S. BALLANCE COMMISSIONER